# EXHIBIT F

(Part 1)

ORIGINAL



UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 05-3524

HON. ROBERT F. KELLY

-------------------------------------X

HEALTHCARE ADVOCATES, INC.,

Plaintiff,

vs.

HARDING, EARLEY, FOLLMER & FRAILEY; JOHN F.A. EARLEY, III, CHARLES L. RIDDLE, FRANK J. BONINI, JR., KIMBERLY TITUS, and JOHN DOES 1-5,

Defendants.

-------------------------------------X

DEPOSITION OF EDWARD W. FELTEN

FRIDAY, FEBRUARY 2, 2007

DEPOLINK

Court Reporting & Litigation Support Services

Phone (973) 353-9880 Fax (973) 353-9445

www.depolinklegal.com

A P P E A R A N C E S:

McCARTER & ENGLISH, LLP
Four Gateway Center, 100 Mulberry Street
Newark, New Jersey 07102-4096
(973) 622-4444
BY: SCOTT S. CHRISTIE, ESQ.
Attorney for the Plaintiff

McKISSOCK & HOFFMAN, P.C.
105 East Evans Street
West Chester, Pennsylvania 19381
610-738-8850
BY: JEFFREY P. LEWIS, ESQ.
Attorney for the Defendants

EDWARD W. FELTEN

Computer Science Department, 35 Olden Street, Princeton, New Jersey 08544, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CHRISTIE:

Q. Good morning, Mr. Felten. My name is Scott Christie. I'm an attorney with McCarter & English in Newark, New Jersey, and I represent Healthcare Advocates, Inc., which is the plaintiff in this lawsuit. You understand that you are here to testify and be deposed in your capacity as an expert witness in this case?

A. Yes.

Q. And you were retained as an expert. Correct?

A. Yes.

Q. Do you understand that you're now under oath?

A. Yes.

Q. And as a consequence of being under oath, you're obliged to answer my questions completely and truthfully?

A. Yes.

Q. Without belaboring in great detail all of the text in your report, is what you have written in here truthful and accurate? And the reason I ask is because you haven't signed it under penalty of perjury or in the form of an affidavit. But if you're able to say that it is accurate and truthful, that would help as opposed to me going through specific topics ad nauseam.

A. Yes. That was my intention when I prepared this, and it is accurate and truthful. There is only one issue that I've learned about since I -- since I submitted the report, and that is at the very end.

Q. What's that?

A. It's in paragraph 69 where I say that "I understand that as of September 1, 2006, it" -- meaning a particular convention "is also enshrined in the Federal Rules of Evidence." And I understand that that should say "instead of the Federal Rules -- the Rules of Civil Procedure."

Q. Are you talking about the recent amendments to the E-Discovery?

A. Yes, that's what I'm referring to. That's the only -- that's the only issue in the report that I've learned of since submitting it.

degree to which the Internet Archive Wayback Machine respects the robots.txt exclusion standard?

A. My understanding is that the Internet Archive's crawlers look for the robots.txt file and follow the -- any request in those files that relate to the Internet Archive's crawlers. The other issue is -- relates to how the Wayback Machine responds to requests for pages -- for historical pages if the -- if there is a robots.txt file present on that site. And that's something that's discussed at some length in my report.

Q. Granted, that's true. And I believe you say in your report -- and please correct me if I'm wrong -- that by virtue of a properly drafted and properly inserted robots.txt exclusion, Internet Archive voluntarily agrees that it will not publicly disclose any existing archive copies of web content for the web site related to the robots exclusion?

MR. LEWIS: Objection to form.

A. That's a pretty involved statement, but --

Q. I'll gladly rephrase it.

A. Okay, please.

Q. It might be easier if I ask you and get it in your words. What is your understanding of the manner in which the Internet Archive Wayback Machine treats existing archive web content when it confronts a robots.txt exclusion?

A. You're asking about what they do now?

Q. First, I'd like to know your understanding of what they did back in July of 2003 and whether that's changed, to your knowledge?

A. As to what they did, that is, at least partly, one of the issues under discussion here, that is, there are questions about what happened, how the Wayback Machine did work during the relevant time in 2003 and -- but I don't know if that's what you're asking about.

Q. Let me rephrase. Back in July of 2003, what was the Internet Archive policy related to its treatment of archive web content upon confronting a robots.txt text string?

A. My understanding is that they said that they did not serve out archived versions of a page if there was a robots.txt file present for that page, but that is not -- apparently not what they

actually did.

Q. Well, we'll get to that. We're talking about their policy. So you're saying that the policy was, in the course of an inquiry, if our servers ping the web site and find a robots.txt exclusion, that we at Internet Archive will not make publicly available existing archive versions of that web site. Is that what you're saying? And if not, please ask -- please rephrase it.

THE WITNESS: Could I hear that again, please?

(Counsel requests the reading of the following testimony:

"QUESTION: So you're saying that the policy was, in the course of an inquiry, if our servers ping the web site and find a robots.txt exclusion, that we at Internet Archive will not make publicly available existing archive versions of that web site. Is that what you're saying? And if not, please rephrase it.")

MR. LEWIS: Objection to form.

A. What I'm saying is that my understanding is at the time they said that they would not serve out archive versions of a page if there was a robots.txt file in place referring to that page.

Q. That begs further questions. Are we talking about page-by-page decision made about releasing archived web content, or are we talking about a web-site-by-web-site determination? And if you don't understand what I mean, I'll rephrase it.

A. No. I understand the question. The -- my understanding is that, at the time, they would apply that -- at the time they said they would apply the requests in a robots.txt file in relation to requests to archived versions of pages, and so whether all pages on a site were treated the same or not would have depended on what was in the robots.txt file.

Q. Well, what if the robots.txt exclusion covered the entire content of the web site, that is, all pages? In your understanding, how would Internet Archive have treated public dissemination upon confronting a robots.txt exclusion under those circumstances?

MR. LEWIS: Again, you're asking for example what their policy was at the time?

MR. CHRISTIE: Yes.

A. According to what they said, they would not have served out archived copies of pages from

that site.

Q. No pages. Correct?

A. Yes. That's according to what they said.

Q. Let me show you what I'll mark as Felten-6.

(Robots.txt file bearing Bates number HCA 00001 is marked as Felten Exhibit 6 for Identification.)

Q. Do you recognize that document, Professor Felten?

A. It looks like a robots.txt file.

Q. Is it one that you've seen before in the course of rendering expert services here?

A. Yes.

MR. CHRISTIE: I'll note for the record that in the bottom right-hand corner there's a designation, HCA 00001.

MR. LEWIS: And for the record, that's a Bates stamp, and that's not part of the actual document.

MR. CHRISTIE: Yes. I didn't mean to imply it was.

Q. Professor Felten, do you understand this document, F-6, to be the robots.txt string that

was present on the Healthcare Advocates web servers during July of 2003?

MR. LEWIS: Objection to form.

A. I don't know.

Q. What do you understand this text string to be?

A. This is -- this appears to be a version of the robots.txt file from the Healthcare Advocates site, but I can't say whether it is or is not the same as what was present in July of 2003.

Q. You have no reason to dispute that it is. Correct?

A. The evidence, I think, does not say whether it is or is not.

Q. I'm asking you a more precise question. Do you have any reason to dispute that this robots.txt string was in place on the Healthcare Advocates web server during July of 2003?

A. Well, beyond the lack of -- beyond there not being evidence as to what exactly was in the file on that date, no, but that's, I think, a reason to object to drawing the conclusion that this is what was in the file as of that date.

Q. I'm not asking for that. Please listen

to my question. I'm asking whether you have any reason to dispute whether this text string was in the robots.txt file of the Healthcare Advocates web server in July of 2003?

A. Yes, I do.

Q. What is the basis for your disputing that?

A. The -- the record does not show specifically what was in that file as of that date. And one of the explanations that might explain what happened with respect to the disputed accesses is that something else was in this file.

Q. But that's pure speculation on your part, isn't it?

MR. LEWIS: Objection to form.

A. Nobody knows precisely what was in that file on that date or precisely what happened with those accesses.

Q. I'm not talking about and asking you about what everyone else knew. I'm asking about you rendering expert opinions in this case.

Do you have any reasons to disbelieve that this was in place at the time?

A. Yes.

Q. What is the specific basis of knowledge,

apart from your speculation, that this robots.txt file that you see in Felten-6 was not in place on the Healthcare Advocates web server in the robots.txt file during July of 2003?

MR. LEWIS: Objection to form.

A. Well, again, there is -- there's not evidence that this, as opposed to something else, was present in that file at that time. And given the behavior of the Internet Archive site at the relevant times, that -- that behavior calls into doubt whether this was, in fact, the content of the robots.txt file on that date.

Q. How does it call that into doubt?

A. Well, the Internet Archive says that their systems were supposed to be programmed, or they thought their systems were programmed to load this, the robots.txt file, and to behave in certain ways. And the evidence shows that their -- the Wayback Machine did not behave in that way, and so that's one indication that the robots.txt file may very well have been different at that time.

Q. But there could have been other reasons that caused the Wayback Machine not to have operated in accordance with Internet Archive

policy at that time. Is that correct?

MR. LEWIS: Objection to form.

A. There could have been, and I discussed this some in my report.

Q. Just so that I understand it, you are not saying definitively that any malfunction of the Wayback Machine during July of 2003 was caused by a failure to properly install a robots.txt exclusion. Is that correct?

A. I cannot say that -- definitively that that is what happened, that's right.

Q. With regard to your view of Mr. Lenky's report, which I will show you at some later point, do you take issue with his conclusion that the "disputed accesses," as you term them, to the archived Healthcare Advocates content on the Internet Archive site were caused by representatives of the Harding Earley law firm?

A. Well, if I'm to respond to what's in his report, I'd like to see his report and see the statement that he made.

Q. Let me show you what I'll mark as Felten-7.

(Report by Gideon Lenky is marked as Felten Exhibit 7 for Identification.)

Q. Specifically, I'm referring you to page 3 and the top of page 4 of Mr. Lenky's report, which, in essence, concludes that computers located at the offices of Harding Earley Follmer & Frailey, the defendant here, were responsible for what you've termed the "disputed accesses," I think was the phrase you used, to the archived Healthcare Advocates web content. I'm asking you whether you agree with or you dispute that conclusion.

A. He says that certain accesses, which are identified here by IP address and by a DNS address, came from Harding Earley, and I have no reason to dispute that. And these are accesses to Internet Archive's site, just to be clear.

Q. Right. And specifically referring to the internet protocol address and the DNS address, which is contained within the second line of page 3 of text. Correct?

A. Yes, yes, that's what I was referring to.

Q. Let's take a look at his analysis and conclusion with regard to the second question, whether there was a text string properly installed on the robots.txt file of the Healthcare Advocates

that could have existed and been that size, 36 to 38 bytes.

Q. Well, based upon your review of the server logs, do you have any reason to dispute his conclusion that Felten-6, number one, is in the range of 36 to 38 bytes, again, based on your review of the server logs?

A. Perhaps I don't understand the question because I don't understand him as asserting that this file that's in front of me here is necessarily that size. As I said before, I don't know whether Felten-6 is or is not the file that was transmitted back then. And he doesn't refer to Felten-6, so I don't know whether he's referring to this document or not.

Q. He's not referring to the document, but if you look, then, two-thirds of the way down on page 4 of his report, do you see the robots text string referenced there?

A. This is what he says was the content of the robots.txt file as of the date of his report.

Q. Yes. And does it mirror what is contained in Felten-6?

A. Yes.

Q. Based upon your analysis of the logs

that you conducted as an expert here, I believe you mentioned in your report that you noted a number of occasions where requests were made for archived Healthcare Advocates web content during the period July 9 through July 14 where those requests were unsuccessful. Correct?

A. Yes.

Q. And I believe you also came to the conclusion that many, if not all, of those unsuccessful requests were due to a robots.txt exclusion being in place.

A. What are you referring to here?

Q. I'm talking about attempts to access archived Healthcare Advocates material from Internet Archive during July of '03 having been unsuccessful.

A. Yes, some requests at that time were unsuccessful.

Q. And specifically, you referred to the fact that there were particular servers of Internet Archive that appear not to have been working accurately with regard to fetching and serving up the robots.txt exclusion. Correct?

MR. LEWIS: What page are you on?

MR. CHRISTIE: I'm looking for it now.

MR. LEWIS: Okay. Fair enough.

Q. For example, paragraph 45, you say, "Based on descriptions available on the Internet Archive's web site, one might have expected the Wayback Machine to refrain from delivering the requested pages. Nevertheless, the Wayback Machine did deliver the pages."

You're referring to the robots.txt exclusion. Correct?

A. Well, partly. Whether the pages would be delivered would depend, in part, on what was in the robots.txt file.

Q. I understand that. I'm asking, I think, a separate question, whether there was a robots.txt file of some sort present on the web site during the relevant period, being July of '03. Are you disputing that there was some sort of robots file?

A. There was a robots.txt file present for at least part of that period.

Q. What part of that period?

A. Well, we have server logs that show some successful accesses to the robots.txt file. And when we see those entries in the server logs, that tells us that there was a robots.txt file of a

certain size present at that time. And it, of course, doesn't tell us what was in the file other than what size it was, beyond what size it was.

Q. But if you look at the logs and you analyze them and the effect of the requests, do you not see that there are denials based on robots exclusions, dozens and hundreds of them throughout the logs?

MR. LEWIS: Objection to form.

A. During the relevant period there were some requests that were denied, yes.

Q. And they were denied based upon the robots exclusion, as you can tell specifically from the text of the logs. Right?

A. You can see from the logs that the page that -- that's called the "query exclusion page" in my report was delivered in some cases, but not all.

Q. Okay. But that's not the question I asked you. The question I asked you is: Based upon your review of the logs, isn't it clear that on dozens and perhaps hundreds of occasions access to the archived content was denied based upon the existence of a robots exclusion?

MR. LEWIS: Objection to the form.

A. The logs say that this query exclusion page was delivered on a number of occasions during that period.

Q. Based upon your knowledge of the Internet Archive and how it works, that page would have been delivered if a robots text file had been in effect at the time. Is that correct?

MR. LEWIS: Objection to form.

A. Had there been a robots.txt file of a certain form at that time, according to what Internet Archive said that this is the page about how their system worked, this is the page that would have been delivered.

Q. When you say, "This is the page," you're referring to --

A. I mean the query exclusion page. And according to what they said, if there was not a robots.txt file, or if it was somehow malformed or not delivered correctly, then the query exclusion page would not be delivered.

Q. And when you say a "query exclusion page," you're referring to Bonini-8?

A. Yes, I'm referring to a page like Bonini-8.

Q. But isn't it also true that if the

robots text string was properly formed and inserted, any requester for the associated web pages would have received a denial screen like Bonini-8?

MR. LEWIS: Objection to form.

A. According to what Internet Archive said at the time, this is -- this is what they said would happen if there were a robots.txt file with that particular content in it at the time. That's what they said.

Q. Okay. And this exclusion page -- well, actually, maybe we should save that for after lunch. I want to ask a few additional questions before we break for lunch.

Is it accurate to say, Professor Felten, that you have no knowledge about whether the robots exclusion on the Healthcare Advocates web site during the period of July of '03 was malformed in any way?

A. I don't know whether it was or not. The available evidence does not allow us to answer that question.

Q. Did you have reason to consult in the course of your duties as an expert here the deposition testimony of any of the representatives

robots.txt file, they will voluntarily change how they treat archived copies of pages.

Q. Meaning they will deny access to third-party requesters?

A. They have said that, yes.

Q. In fact, isn't it true from reviewing the logs, Bonini-6 and Mohr-2, that you've noticed a number of instances where that has, in fact, taken place, meaning that a request has been made, a robots exclusion has been identified, and no content has been produced?

A. There are places in the logs where a request is made and the Wayback Machine provides the so-called "query exclusion pages" rather than providing the requested content.

Q. Which is Bonini-8?

A. Yes, the query exclusion pages is what looks like Bonini-8.

Q. Do you agree with the proposition, based upon your analysis, that such a page, Bonini-8, would only be served up by Internet Archive if there is a properly configured and installed robots.txt exclusion on the web site?

MR. LEWIS: Objection to form.

A. Not necessarily.

Q. Would have under all circumstances.

A. I don't know whether it would have under all circumstances.

Q. What circumstances are you aware of that it may not have been served up?

A. Well, if we -- if we look at the available evidence about the accesses that are at issue here, we don't know whether -- we don't know whether the -- whether, at the time those accesses were made, the Wayback Machine saw a robots.txt file or -- and if it did see a robots.txt file, exactly what was in it. And we see some requests being satisfied. And so based on that, we can't say whether the situation you described would always happen -- would always have happened back then.

Q. If a properly configured robots.txt file -- and when I say "properly configured," I mean properly drafted to exclude the Internet Archive crawler -- had been captured by Internet Archive and cached, would you agree that in response to an inquiry for archive content related to that robots file, Internet Archive served up the denial screen, Bonini-8, during July of '03?

MR. LEWIS: Objection to form.

A. Well, we know that Internet Archive did serve up the query exclusion page in some cases during July of 2003. And it may be that in some of those cases there was a cached robots.txt file of the form you described. So it seems likely that that would have happened at least sometimes.

Q. Are you aware of any instances in July of '03, based upon your analysis, where the access denial screen Bonini-8, was served up when there wasn't a properly configured robots file in the Internet Archive cache?

A. I don't know whether that happened or not.

Q. Let me turn your attention to paragraph 35 of your report. You mention that "The requests in a robots.txt file applied, by definition, only to crawlers. They do not apply to people."

What do you mean by that?

A. Well, there's a distinction between a crawler, which is a computer program -- and I describe crawlers elsewhere in my report -- versus people. And the document which I call here "The Standard for Robot Exclusion" in my report talks about how robots.txt files can be written to apply to different crawlers, but there -- but the

robots.txt rules apply only to crawlers. There's nothing in that system to make statements about access by human beings.

Q. You understand this case involves strictly the Internet Archive crawler. Correct?

MR. LEWIS: Objection to form.

A. That's the only crawler that is involved, but there are, of course, people involved as well.

Q. Do you understand that any part of this lawsuit has anything to do with a robots.text exclusion drafted specifically to exclude any representatives of the Harding Earley law firm?

A. No, no robots.txt file could be drafted to exclude members of the law firm.

MR. LEWIS: You mean that specifically?

A. I mean that specifically in the sense that robots.txt files do not talk about people. They apply to crawlers.

Q. They interact with crawlers and, in some cases, direct crawlers' activity. Correct?

A. Crawlers sometimes read them and sometimes alter their behavior based on what's in the files.

Q. You mentioned that, as part of your

Q. As far as you know, that's accurate?
A. As far as I know.
Q. Let me turn your attention to Mr. Lenky's report, specifically -- I'm sorry. What's the number on that?
A. The Felten-7.
Q. -- Felten-7, specifically, paragraphs 5 and 6. Paragraph 5 --
A. Could I have a minute to review this?
Q. Oh, yeah, of course.
A. Okay.
Q. First, focusing your attention on paragraph 5, do you see in the first sentence in the answer to that question, it mentions that "Based upon a reasonable degree of technical certainty, the number of requests for protected HCA content originating from defendant's IP was 549 on July 9, '03, and 118 on July 14, of '03."
Do you see that portion of the report?
A. Yes, I see that.
Q. Do you have any reason to dispute those numbers?
A. These numbers are at least in the right ballpark.
Q. You have no specific evidence to dispute

their accuracy. Correct?

A. I made some effort to replicate these numbers and came out with results that were close to this, so I could say they're in the right ballpark.

Q. Let's look at paragraph 6, and I'll ask you the same question about the numbers that Mr. Lenky concludes in that paragraph. Please take a minute and review it if you'd like.

A. Okay.

Q. The last sentence of his answer in paragraph 6, do you dispute that conclusion?

A. These numbers, again, are at least in the right ballpark at least. And I should point out just to clarify that the questions that Mr. Lenky is answering here refer to unauthorized access. And without -- and if so -- in my answer I'm setting aside the question of whether the accesses were unauthorized or authorized as opposed to successfully or unsuccessfully --

Q. I understand. Right. So we're talking about whether they were, authorized or not, attempted accesses to the archived content and successful accesses in both paragraphs 5 and 6. Right?

A. Yes.

Q. Turning your attention to paragraph 4 of his report, let me refer you to the bottom of page 9 where he says, right before the end of that page, "Based on a reasonable degree of technical certainty, the number of times the defendant(s)" -- 's' being in parentheses -- "viewed the robots.txt exclusion pages was 498 on 9 July 2003, 35 on 10 July 2003, 7 on 11 July 2003, and 104 on 14 July 2003."

Do you dispute that conclusion, Professor Felten?

A. Let me take a minute to review this.

Q. Sure.

A. I'm not certain whether these numbers are correct.

Q. Okay. Do you have any reason to dispute their accuracy?

A. Yes.

Q. What is the basis for your disputing their accuracy?

A. Mr. Lenky's making an assumption here that any file that is between 4,500 and 5,000 bytes in size and doesn't meet certain other criteria must be an instance of the exclusion

page, and I'm not certain that's correct. There could well have been other pages present which were of that size, and, if so, then Mr. Lenky's results is wrong. And he doesn't appear to account for that possibility.

Q. But assuming that that is accurate, that pages between 4500 and 5,000-dollar -- sorry -- 4500 and 5,000 bytes in size and considering the other criteria that he mentioned, all that is accurate, would you then agree with his conclusion?

A. You've got to be more precise about what you're asking me to assume --

Q. Okay.

A. -- because there was an "all that."

Q. Well, you weren't entirely clear yourself. I believe you mentioned that you had a problem with the fact that he based his conclusion, in part, on the fact that the robots exclusion page, Bonini-8, is between 4500 and 5,000 bytes in size, plus there were other criteria that he used to exclude certain other pages, which may be in that same range. So I'm asking you: Assuming that the facts he relied upon to reach that conclusion in that paragraph,

which ends with the conclusion that we're talking about, assuming those facts are accurate, would you then agree with his conclusion?

A. No, not necessarily because he does not state that there are no other files of that size in the log. That appears to be an assumption in his calculation which he's not stating here. So based just on what he says here, you can't reach, I think, the conclusion that he reaches.

Q. Assuming he got that information from an authoritative source like Gordon Mohr, the chief technologist at Internet Archive, would that lead you to accept his conclusion?

A. Well, if the information is whether there could have been other pages on the Internet Archive site between 4,500 and 5000 bytes in size, I'd be very skeptical that Mr. Mohr could remember that now, whether there were any pages present within that size range, which is a relatively common size range for web sites. And Mr. Lenky does not state that there were not other pages of that size, let alone giving any basis for concluding that.

Q. You don't know, for example, whether Mr. Mohr, contemporaneous with the July 2003