**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|   |   |   |
|---|---|---|
| | : | |
| HEALTHCARE ADVOCATES, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 05-3524 |
| | : | |
| HARDING, EARLEY, FOLLMER & | : | |
| FRAILEY, et. al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

_____

**<u>MEMORANDUM</u>**

**ROBERT F. KELLY, Sr. J.**                                        **JULY 20, 2007**

Presently before this Court is the Motion for Summary Judgment filed by Defendant

Harding, Earley, Follmer & Frailey, John F.A. Earley III, Charles L. Riddle, Frank J. Bonini Jr.,

and Kimber Titus (collectively the "Harding firm").  Also before this Court is the Motion for

Partial Summary Judgment filed by Plaintiff Healthcare Advocates, Inc.  For the following

reasons, Defendants' Motion for Summary Judgment is granted, and Plaintiff's Motion for

Partial Summary Judgment is denied.

**I.      BACKGROUND**

Healthcare Advocates is a patient advocacy organization that assists its members in their

dealings with health care providers.  The Harding firm is a boutique law firm located in suburban

Philadelphia that focuses its practice on intellectual property law.  Healthcare Advocates was the

plaintiff in a lawsuit filed in June of 2003 by its founder and president Kevin Flynn in which he

alleged that a competitor of the company infringed trademarks and misappropriated trade secrets

belonging to Healthcare Advocates.  The Harding firm represented the defendants in that lawsuit,

an action which was dismissed by this Court on summary judgment.  <u>Flynn v. Health Advocate,</u> <u>Inc.</u>, 2005 WL 288989, No. 03-3764 (E.D. Pa. Feb. 8, 2005) (hereinafter the "Underlying Litigation").

The present civil action arises out of events that occurred in the pre-discovery phase of the Underlying Litigation. The facts of this case are relatively simple.  Healthcare Advocates commenced the Underlying Litigation by filing a complaint on June 23, 2003.  After receiving the complaint, the Harding firm began investigating the facts behind the allegations contained therein.  The investigation led the Harding firm to search on the Internet for information about Healthcare Advocates.  On July 9, 2003, and July 14, 2003, employees of the Harding firm accessed a website operated by the Internet Archive (www.archive.org), and viewed archived screenshots[1] of Healthcare Advocates' website (www.healthcareadvocates.com) via a tool contained on Internet Archive's website called the Wayback Machine.  The Wayback Machine allowed the Harding firm to see what Healthcare Advocates' public website looked like prior to the date the complaint was filed in the Underlying Litigation.

Viewing the content that Healthcare Advocates had included on its public website in the past was very useful to the Harding firm in assessing the merits of the trademark infringement and trade secret misappropriation claims brought against their clients.  The Harding firm also printed copies of each archived screenshot of Healthcare Advocates' public website that they viewed via the Wayback Machine.  The images were used during the course of the Underlying Litigation.  The Harding firm did not actively save any of the screenshots they viewed onto their

---

[1]  A screenshot is an image taken by the computer to record the visible items displayed on the monitor or another visual output device. Usually this is a digital image taken by the host operating system or software running on the computer device, but it can also be a capture made by a camera or a device intercepting the video output of the computer.  Wikipedia, The Free Encyclopedia, "Screenshot" available at http://en.wikipedia.org/wiki/Screenshot.

computer hard drives.

In this civil action, Healthcare Advocates alleges that the Harding firm's use of the Wayback Machine to obtain archived screenshots constituted "hacking."  While the word hacking is not defined in the Complaint, Healthcare Advocates claims that the Harding firm manipulated the Wayback Machine on July 9, 2003, and July 14, 2003, in a way that rendered useless a protective measure that it had employed on its website.  The protective measure at issue was a *robots.txt* file.  Healthcare Advocates placed this file on its website as a means of preventing the public from accessing archived screenshots of www.healthcareadvocates.com that were present on Internet Archives' database.  Healthcare Advocates believes that the robots.txt file acted like a digital padlock.  Since the Harding firm did not have the "key," Healthcare Advocates argues that they could only have obtained these protected images by breaking the robots.txt "lock."

By way of background, the Internet Archive is a nonprofit organization that has created an online library of digital media in an effort to preserve digital content for future reference.  Its digital database is equivalent to a paper library, but is filled with digital media like websites instead of books.  The library includes a collection of chronological records of various websites which Internet Archive makes available at no cost to the public via the Wayback Machine.  The library's records include more than 85 billion screenshots of web pages which are stored on a computer database in California.  Internet Archive's database provides users with the ability to study websites that may have been changed or no longer exist.

The chronological records are compiled by routinely taking screenshots of websites as they exist on various days.  Internet Archive collects images through a process called crawling.

3

A crawler or robot is an automated program that scours the Internet and takes pictures of every web page that it is instructed to visit.  The most widely recognized use of screenshots is for indexing by search engines.  Through indexing, search engines such as Google create lists of websites.  These lists allow the search engine to provide faster searches, because the sites are all cataloged in the search engine's memory which negates the need to access the web to compile search results.  A crawler provides the new screenshots Internet Archive uses to complete its chronologies.

Any person with a web browser can search Internet Archive's database of archived images.  Searching the database is accomplished via the Wayback Machine, which Internet Archive provides on its website.  The Wayback Machine is an information retrieval system that allows the user to request archived screenshots of web pages that may be contained on the database, and it is easy to use.  First, a person logs onto Internet Archive's website located at *www.archive.org,* where the user will see a box in the middle of the homepage bearing the title "Wayback Machine."  In the box there is a small input field.  The user enters the web address of the desired site into the input field, following the *http://* prompt, and hits the "Take Me Back" button found directly below to initiate a search of Internet Archive's database.

If screenshots matching the user's web address request are available, a list of the dates on which images were taken is displayed on the user's computer screen in vertical columns grouped by year.  Clicking on a particular date retrieves the screenshots of the website archived for that specific date.  The image appears in the user's web browser just like a live website would appear, however, the user is not viewing a live website.  Instead, the user sees the static version of the website that is stored in Internet Archive's database.  The Wayback Machine only provides a

4

window into the past where users can see what a website looked like on a specific date.

The creators of the archives seek only to include publicly available websites in their library.  Websites that require passwords for access are neither included nor crawled.  Website owners who do not want their sites preserved in the database can request to be excluded.  Internet Archives has an exclusion policy in place that accommodates these requests, i.e. the robots.txt protocol.

The robots.txt file would not control access to Healthcare Advocate's website, it only controlled the information that was available once the website was accessed.

Internet Archive's adherence to the robots exclusion protocol provided two benefits to website owners in practice.  First, for those websites that did not have a robots.txt file present at the website's inception, but included it later, Internet Archive would remove the public's ability to access any already archived screenshots stored in its database.  The archived images were not deleted, but were instead rendered inaccessible to the general public.  Second, the crawler employed by Internet Archive would be instructed not to gather screenshots of that website in the future.  Those were the terms of the exclusion policy in effect when Healthcare Advocates placed a robots.txt file on its website.

Healthcare Advocates had not included a robots.txt file on its website prior to July 7, 2003.  Consequently, Internet Archive's database included screenshots of Healthcare Advocates' website.  Kevin Flynn, president of the company, remembered first placing a robots.txt file on the website on either July 7, 2003, or July 8, 2003.  He is unsure of the exact date.  Once the file was included, Mr. Flynn expected that the public would be denied access to any archived images of Healthcare Advocates' website stored in Internet Archive's database in accord with the exclusion

5

policy.  Normally, the public would have been denied access.  However, on the dates in question Internet Archive's servers malfunctioned, and provided Healthcare Advocates archived images to those who requested them.

The images were blocked through an automated process.  When requests were made via the Wayback Machine, the servers automatically checked to see if a robots.txt file existed on the website which was the origination of the archived images being requested.  If a robots.txt file was present, then the Wayback Machine would return a message stating that the archived images were blocked by the website owner via a robots.txt file.  Internet Archive blocked the archived screenshots on an all or nothing basis.  If a website owner blocked any portion of his website, then public access was denied for all web pages contained in the database.  But, when the Harding firm used the Wayback Machine on July 9, 2003, and July 14, 2003, the servers which checked for robots.txt files and blocked the images were malfunctioning.  Internet Archive's servers did not respect the robots.txt file on Healthcare Advocates' live website.  Thus, the Harding firm was able to view and print copies of archived screenshots of Healthcare Advocates' website stored in Internet Archive's database.

Plaintiffs' expert, Gideon Lenkey, has testified that the Harding firm was able to view archived screenshots of Healthcare Advocates' website because the servers at Internet Archive were not respecting robots.txt files.  Mr. Lenkey also testified that the Harding firm did not engage in "hacking."  Kimber Titus and Charles Riddle, two of the individuals who used the Wayback Machine, for the Harding firm, testified that they followed the procedure outlined above in conducting their searches.  However, Healthcare Advocates does not believe that the Harding firm followed the standard practice used to search archived screenshots via the Wayback

6

Machine.  Healthcare Advocates claims that the Harding firm circumvented the protective measure it had in place.

Circumventing an electronic protective measure violates federal law.  Thus, Healthcare Advocates brought this Civil action against the Harding firm, Internet Archive, and various John Does.  The Complaint was filed on July 8, 2005 and contained thirteen counts.  Seven of those claims were dismissed by Order of this Court on October 4, 2005.  Healthcare Advocates filed a Second Amended Complaint on May 30, 2006, composed of thirteen counts against the Harding firm and Internet Archive.  Internet Archive was dismissed by stipulation on August 31, 2006, and with it counts VIII through XIII.  Healthcare Advocates has voluntarily dismissed counts IV and VII.  All remaining claims, counts I, II, III, V, and VI, are addressed in this Memorandum.

Count I of Healthcare Advocates' Second Amended Complaint alleges a violation of the Digital Millennium Copyright Act ("DMCA") which prohibits the circumvention of protective measures that restrict access to copyrighted works.  In count II, Healthcare Advocates alleges that the Harding firm infringed on its copyright rights by viewing and printing copies of the archived images of the Healthcare Advocates' web pages, by unknowingly saving copies of these web pages in temporary files known as caches, and by distributing the images to their co-counsel in the Underlying Litigation.  Count III states a claim against the Harding firm for violating the Computer Fraud and Abuse Act ("CFAA") by intentionally exceeding their access and obtaining information from protected computers used in interstate commerce.  Counts V and VI are for conversion and trespass to chattels under Pennsylvania's common law.

This Civil action is presently before this Court on the Motion for Summary Judgment of the Harding firm on all five claims, and the Motion for Partial Summary Judgment of Healthcare

Advocates on only the DMCA and CFAA claims.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  See also Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  The non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence showing that there is a genuine factual dispute requiring a trial.  Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992).  A genuine factual dispute exists when "a reasonable jury could return a verdict in favor of the non-moving party."  Embrico v. U.S. Steel Corp., 404 F. Supp. 2d 802, 817 (E.D. Pa. 2005).  When a party fails to establish an element of their case, summary judgment must be granted.  Celotex, 477 U.S. at 322.

## III.    DISCUSSION

### A.    Copyright Infringement

A person commits copyright infringement by violating one or more of the exclusive rights

8

of the copyright owner as enumerated in 17 U.S.C. § 106 (2007).[2]  Infringement occurs when a person reproduces, adapts, distributes, publicly performs or publicly displays a work protected by the Copyright Act in an unprivileged way.  These exclusive rights of copyright holders are codified in statute at § 106 of the Copyright Act, and they delineate the boundary between copyright infringement and non-infringing use.  In the event that infringement has occurred, an infringer may be excused from liability under the doctrine of fair use.  Determining whether fair use applies in an infringement case is a mixed question of law and fact that this Court may decide.  Harper & Row Publishers, Inc. v. Nation Enter., 471 U.S. 539, 560 (1985).

Fair use is a judicially created defense to a claim for copyright infringement. Congress codified this common law defense in the Copyright Act of 1976.  17 U.S.C. § 107.[3]  Under the

---

[2]  § 106. Exclusive rights in copyrighted works
Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

[3]  § 107. Limitations on exclusive rights: Fair use
Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--

doctrine, a court must consider four factors in making a determination that the defendant is entitled to a defense of fair use for his infringing activity. Those factors are: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used, and (4) the effect of the use upon the potential market for or value of the copyrighted work. This doctrine is relevant as the Harding firm has offered it as a complete defense to their actions.

Healthcare Advocates alleges that its exclusive rights of display, reproduction, and distribution were violated when the Harding firm viewed and printed copies of archived images of its copyright protected web pages via the Wayback Machine. The Harding firm maintains that its use of these screenshots was allowed under fair use. In the Complaint, Healthcare Advocates alleges that the Harding firm violated their copyright rights in four specific ways. (2d Am. Compl. ¶ 79-82.) Paragraph 79 alleges that employees of the Harding firm unlawfully displayed archived screenshots of Healthcare Advocates' website by viewing the images returned by the Wayback Machine on their computers in their offices. In paragraph 80, Healthcare Advocates alleges that the Harding firm unlawfully reproduced the archived images by knowingly storing

---

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

The Second Circuit has said, "[t]he doctrine of fair use . . . permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." Iowa State Univ. Research Found., Inc. v. Am. Broad. Co., 621 F.2d 57, 60 (2d Cir. 1980).

copies of the screenshots onto their computer hard drives.  Paragraph 81 states that the Harding

firm unlawfully reproduced copyrighted images by printing paper copies of the archived

screenshots off of their computers.  Finally, paragraph 82 alleges that the Harding firm

unlawfully distributed copies of the screenshots to their co-counsel in the Underlying Litigation.

A copyright holder must show two things to establish a case of infringement: (1) he must

demonstrate ownership of a valid copyright, and (2) he must show that the defendant has copied,

displayed, or distributed protected elements of the copyrighted work.  William A. Graham Co. v.

Haughey, 430 F. Supp. 2d 458, 465 (E.D. Pa. 2006); see Whelan Assoc., Inc., v. Jaslow Dental

Lab., Inc., 797 F.2d 1222, 1231 (3d Cir. 1986); see also G. Peter Albert, Jr. and Laff, Whitesel &

Saret, Ltd., Intellectual Property Law in Cyberspace 247 (1999).  Regarding the first element,

Healthcare Advocates attached to the Complaint copies of the registration forms submitted to the

Copyright Office.  These forms are prima facie evidence of copyright ownership.  Thus,

Healthcare Advocates has established the first element of the test.  See Television Digest, Inc. v.

U.S. Tel. Ass'n, 841 F. Supp 5, 8 (D.D.C. 1993).  The second elements, whether Defendants

have displayed, reproduced, or distributed the copyrighted material, and whether the defense of

fair use applies, will be discussed individually below.

Public display of a copyrighted work is a right reserved to the copyright owner.  17

U.S.C. § 106(5).  The concept of display is defined rather broadly under the statute.  "To

'display' a work means to show a copy of it, either directly or by means of a film, slide,

television image, or any other device or process[.]"  17 U.S.C. § 101.  Displaying a work publicly

means to "display it at a place open to the public or at any place where a substantial number of

persons outside of a normal circle of a family and its social acquaintances is gathered[.]"  Id.  The

11

facts show that Defendants Riddle and Titus accessed archived screenshots of Healthcare

Advocates' website via the Wayback Machine, and the images were displayed on their

computers.  (Pl's Mot. Partial Summ. J. Ex. D, Riddle Dep. at 117; Ex. E, Titus Dep. at 68-78.)

Under the expansive definition of public display, the display of copyrighted images on computers

in an office constitutes a public display.  See On Command Video Corp. v. Columbia Pictures

Indus., 777 F. Supp. 787 (N.D. Cal. 1991).  Thus, Healthcare Advocates has satisfied the second

element of the infringement test.

The next question is whether the Harding firm's infringement of Healthcare Advocates'

right of public display is permissible under the fair use doctrine.  Recent case law dealing with

the right of display shows that claims of this nature frequently arise in conjunction with claims

where other exclusive rights are also implicated.  Healthcare Advocates's claims are no different.

It alleged that the Harding firm's activity infringed on both its rights of public display and

reproduction.  The facts related to these rights are similar, and the discussion of the applicability

of the fair use doctrine will addresses the same points.  Therefore, in the interest of judicial

economy, I will discuss these two infringement claims together in my analysis of the fair use

doctrine's applicability in this case.

A copyright holder also has the exclusive right of reproduction in his copyrighted work.

17 U.S.C. § 106(1).  This is regarded as the most fundamental of the copyright rights available to

a copyright holder.  See Marshall Leaffer, Understanding Copyright Law 290 (3d ed. 1999).  A

copy is defined in the Copyright Act as "a material object . . . in which a work is fixed by any

method now known or later developed, and from which the work can be perceived, reproduced,

or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. §

101.  Kimber Titus, a paralegal at the Harding firm, stated at her deposition that paper copies were made of each copyrighted image she viewed through the Wayback Machine.  (Pl's Mot. Partial Summ. J. Ex. E, Titus Dep. at 80).  Healthcare Advocates' right of reproduction was infringed, and Healthcare Advocates has satisfied the test's second element.

The next question is whether printing exact copies of these archived images for use in litigation is an infringing activity that should be excused under the doctrine of fair use.  As stated above, these claims will be analyzed under fair use together.  The doctrine of fair use requires this Court to consider four factors.  The first factor is the purpose and character of the infringing use. 17 U.S.C. § 107(1)   This inquiry focuses on whether the use is commercial or educational. Id.  Commercial use is less favored than educational use, but use by a commercial enterprise will not preclude the applicability of fair use.  See Assoc. Of Am. Colleges v. Mikaelian, 571 F. Supp. 144, 152 (E.D. Pa. 1983).

The Harding firm makes a living by charging clients for defending their rights in court. Consequently, the practice of law can be characterized as a profit making venture as Healthcare Advocates argues, but "the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry[.]" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 584 (1994).  "If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" Id.  Therefore, I must consider more than the fact that law firms operate for profit in this analysis.

The Harding firm's purpose in viewing and printing copies of the archived images of

Healthcare Advocates' website was primarily to defend their clients.  The Harding firm viewed

these archived web pages to assess the merit of the claims brought against their client.  They

hoped they might discover facts allowing them to refute the allegations.  Charles Riddle stated in

his deposition that he used the Wayback Machine to find out what the complaint was talking

about, as he was unsure of the alleged infringement from the face of the complaint.  (Def. Mot.

Summ J. Ex. I, Mohr Dep. at 118.)  Healthcare Advocates did not specify what had been

infringed, nor did it attach any documents to the complaint in the Underlying Litigation showing

infringement.  The Harding firm viewed the documents on their computers because that was the

method by which the Wayback Machine worked.  Recent case law on public display in the

Internet era is relevant to this Civil action.  In the cases below, website owners infringed display

rights by making copyrighted work, usually pictures, of another available for the public to view

on their websites without the consent of the owners.  The infringers also usually charged a fee.

See On Command Video Corp., 777 F. Supp. at 787-91; Playboy Enters., Inc. v. Frena, 839 F.

Supp. 1552 (M.D. Fla. 1993); Perfect 10 v. Google, Inc., 416 F. Supp. 2d 828 (C.D. Cal. 2006)

(affirmed in part, reversed in part at Perfect 10, Inc., v. Amazon.com, Inc., 2007 U.S. App.

LEXIS 11420).  Users of the infringers' websites were able to view and sometimes save the

copyrighted images on their own computers.

     The Harding firm did not use the copyrighted images in a manner similar to the infringers

in the above cases.  The Harding firm did not make these images available to others on any

website.  They viewed them in their offices.  Those cases do not address the situation here.  In

this civil action, only other members of the firm were able to see the images on the computer

screens in the Harding firm's offices.  While other members of the Harding firm were able to see

the images, the Harding firm did not purposefully display them to others.  The public display was a result of the Harding firm viewing the images in their offices.  Only a small group of additional employees were able to see these images.  This group is similar to a family circle and its acquaintances.  The statute says that public display is a showing to a group outside this family circle or acquaintances.  17 U.S.C. § 101.  The Harding firm's conduct is not similar to the situations where courts have found that individuals were liable for infringing the right of public display.

The purpose behind printing the archived images was to make a record of what was viewed.  The Harding firm copied these materials as supporting documentation for the defense they planned to raise for their clients against the allegations.  It would be an absurd result if an attorney defending a client against charges of trademark and copyright infringement was not allowed to view and copy publicly available material, especially material that his client was alleged to have infringed.[4]  The Harding firm also recognized that the material was relevant to the case as soon as they saw the archived images, and they saved hard copies of the images accordingly.  (Pl's Mot. Partial Summ. J. Ex. B, Bonini Dep. at 231.)  The Harding firm viewed and copied the archived images of a public website in an attempt to defend their client against a charge of copyright infringement.  The purpose of the Harding firm's infringing activity militates in favor of a finding of fair use in this case.

The second factor that I must consider is the nature of the copyrighted work.  17 U.S.C. §

---

[4]  It should be noted that the alleged infringing activity happened two weeks after the complaint in the Underlying Lawsuit was filed.  Healthcare Advocates did not attach the materials that defendants, clients of the Harding firm, were alleged to have infringed.  The defendants were not informed about what exactly they were alleged to have infringed.  Acting prudently and reasonably, the Harding firm attempted to find all publicly available information on Healthcare Advocates in their efforts to decipher the allegations contained in the Complaint.

107(2).  One of the more important things here is the fact that the Harding firm obtained and copied information originally made publicly available.  Healthcare Advocates' website was used in a marketing capacity for the company.  It informed the public about the services Healthcare Advocates provided.  (Pl's Mot. Partial Summ. J. Ex. A, Flynn Dep. at 30.)  The website was primarily a marketing tool, and Kevin Flynn, president of the company, stated that the original purpose of the website was advertising.  (Id.)  The website included contact information, descriptions of the services provided, testimonials from satisfied users, answers to frequently asked questions, and cost of the service.  See Healthcare Advocates' website *available at* http://www.healthcareadvocates.com (last visited July 2, 2007).

Healthcare Advocates copyright protected its website to prevent competitors from gaining an advantage by being able to pilfer its promotional and marketing tools.  (Pl's Mot. Partial Summ. J. Ex. A, Flynn Dep. at 170.)  The purpose of copyright protection generally is to stimulate creativity for the public good.  G. Peter Albert Jr. and Laff, Whitesel & Saret, Ltd., Intellectual Property Law in Cyberspace, 207 (1999).  "Because the ultimate goal of copyright law is to increase our fund of information, the fair use privilege is more extensive for works of information[.]" Marshall Leaffer, Understanding Copyright Law 436 (3d ed. 1999) (citing Sony Corp. of Am., v. Univ. City Studios, Inc., 464 U.S. 417 (1984)).  The nature of these works is predominately informational.  This factor works in the Harding firm's favor as well in this fair use determination.

The third factor that must be considered is the amount and substantiality of the portion of the copyrighted work used.  17 U.S.C. § 107(3).  There is no disagreement that the Harding firm viewed and copied in their entirety all of archived web pages they viewed through the Wayback

16

Machine.  The question is whether the Harding firm copied more than was necessary and justifiable under the fair use doctrine.  See Marshall Leaffer, Understanding Copyright Law 438 (3d ed. 1999) ("excessive copying not commensurate with the purpose of the use loses the privilege of fair use.").  This is not a quantitative determination, but rather a qualitative one.  See Harper & Row Publishers, Inc., 471 U.S. at 564-65.  The fact that a party copies only a little of a work is not dispositive.  In the Harper & Row case, the infringer copied a very small portion, 300 words, of an unreleased 200,000 word novel in a magazine article.  The courts found that while the portion copied was small in comparison to the majority of the work, the copied portion was the heart of the work.  That fact worked against a finding of fair use.

Thus, even though the Harding firm copied everything, I must assess the import of their actions in so doing.  It was necessary for them to copy everything they viewed because they were using these screenshots to defend their clients against copyright and trademark infringement claims.  The defense was that the material infringed was information posted on the company's public website.  The Harding firm was justified in viewing and printing as many versions of the website as necessary to show that the material had been made public.  More importantly, as discussed below, the material was relevant evidence in the Underlying Litigation, and the firm had a duty to preserve relevant evidence.  They fulfilled that duty by printing copies.  Therefore, the substantiality of the portion used does not militate against a finding of fair use.

Finally, I must consider the effect of the Harding firm's use upon the potential market for or value of the copyrighted work.  17 U.S.C. § 107(4).  As Kevin Flynn stated, these copyrighted webpages were used as advertising and marketing tools by Healthcare Advocates.  They have value in the sense that they may be effective tools that help generate new customers and maintain

17

existing ones.  This value was not affected by the Harding firm's use.  The screenshots were used

only in a lawsuit.  The Harding firm is not a competitor of Healthcare Advocates, and the firm

has no use for the marketing and advertising strategies employed by players in the patient

advocacy business.  The Harding firm did not seek to gain a competitive advantage.

Most importantly, the images viewed and copied were archived versions of Healthcare

Advocates' website which the company no longer utilizes, suggesting their worth is negligible.

Similarly, these archived web pages were once available for the world to view on Healthcare

Advocates website.  Copies of the images may exist all over the world.  The impact of the

Harding firm's viewing and copying on the value of this copyrighted material is negligible.

Analysis of this forth element militates in favor of a finding of fair use.  The analysis of all four

factors shows that a finding of fair use by the Harding firm is warranted.  Thus, this Court holds

that the Harding firm's infringing use is excusable under the doctrine of fair use.

Healthcare Advocates also claims that the Harding firm infringed its right of reproduction

when they impermissibly saved copies of the archived screenshots onto their computer hard

drives.  However, Plaintiff has presented no evidence showing that the Harding firm purposely

saved these images.  Instead, Healthcare Advocates argues that the images were involuntarily

saved in temporary files on the Harding firm's computers.  Thus, the firm's duty to preserve

extended to these temporary files.  Since the files are lost, Plaintiff alleges that the Harding firm

failed to fulfill their duty to preserve. Healthcare Advocates believes that if these temporary

cache files had been preserved, they would have been able to determine if the Harding firm used

the archived images for any purpose other than what has been alleged or admitted.  Healthcare

Advocates believes it is prejudiced without this evidence, and thinks the loss of these temporary

18

files entitles it to a spoilation inference at trial.

A party to litigation has an obligation to preserve relevant evidence.  "While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."  Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).

A spoilation inference is an "evidentiary rationale [that] is nothing more than the common sense observation that a party who has notice that [evidence] is relevant to litigation and who proceeds to destroy [evidence] is more likely to have been threatened by [that evidence] than is a party in the same position who does not destroy the [evidence]."  Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 78 (3d Cir. 1994).  In the Schmid case, the Third Circuit set forth its balancing test for evaluating whether sanctions are appropriate when evidence is lost.  The considerations are: (1) the degree of fault of the party who altered or destroyed the evidence, (2) the degree of prejudice suffered by the opposing party, and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and where the offending party is seriously at fault, will serve to deter such conduct by others in the future.  Id. at 79.

The first question that must be addressed is what degree of fault must be attributed to the Harding firm for this failure to preserve temporary files.  A cache file is a temporary storage area where frequently accessed data can be stored for rapid access.  When a computer accesses a web page, it will sometimes store a copy of the web page in its cache in case the page is needed again.  (Pl's Mot. Summ. J. Ex. F, Expert Report of Edward Felton at 5.)  Some cache files are discarded

after only twenty-four hours.  (Id. at 6.)  When the Harding firm viewed archived screenshots of Healthcare Advocates' website through the Wayback Machine, copies of the screenshots may have been automatically stored in the cache files of the Harding firm's computers.  The facts show that the Harding firm made no effort to preserve these temporary files immediately after they used their web browsers.

Healthcare Advocates argues that this fact alone warrants imposition of a spoliation inference. It claims that the Harding firm knew immediately on July 9, 2003, and July 14, 2003, that they had a duty to preserve the cache files on their computers.  In support of its assertion, Healthcare Advocates has offered the answer that the Harding firm provided in their response to an interrogatory.  The Harding firm answered question 15 of the Plaintiff's First Set of Interrogatories by stating that the firm "became aware that information relating to the conduct of its representatives on July 9, 2003 and July 14, 2003 as alleged in the Complaint may be relevant to the underlying action immediately upon first observation of the downloaded documents from the www.archive.org website."[5]  (Pl's Mot. Partial Summ. J. Ex. C.)

Healthcare Advocates reads this answer to state that the Harding firm anticipated that they would be sued for violating a statute enacted to combat "hacking" when they accessed a public website via a web browser.  Healthcare Advocates' inference that the Harding firm immediately knew that its actions in using a public website to obtain archived screenshots of another public website would open them up to liability under the DMCA is unreasonable.  This

---

[5] INTERROGATORY NO. 15

Explain when and how HEFF first became aware that information relating to the conduct of its representatives on July 9, 2003 and July 14, 2003 as alleged in the Complaint may be relevant to the Underlying Action.

answer shows that the Harding firm knew these archived images were relevant to the Underlying Litigation, and that they had a duty to preserve any copies they printed.  What the Harding firm should have anticipated was that the images they copied would be relevant, which they did and saved accordingly.  (See generally Pl's Mot. Partial Summ. J. Ex. B, Bonini Dep. at 250-51.) The Harding firm had no reason to anticipate that using a public website to view images of another public website would subject them to a civil lawsuit containing allegations of hacking.

Healthcare Advocates further argues that since the Harding firm clearly knew that the cache files were relevant, they should have immediately removed the computers from further use for fear that these temporary files might be lost.  Healthcare Advocates believes that the failure to take this measure simply "shocks the conscience."  (Pl's Br. Mot. Partial Summ. J. at 23.)  As stated above, this Court has not seen any evidence showing that the Harding firm knew or should have known that a lawsuit under the DMCA was likely, or that temporary cache files would be sought.  Thus, the failure to immediately remove computers that the firm used everyday, when they had no reason to believe that their actions would subject them to a lawsuit for "hacking," is not an action that shocks the conscience.

Alternatively, Healthcare Advocates states that even it the Harding firm was not immediately aware of their duty, they were informed of the need to preserve these temporary files in the letter sent by Healthcare Advocates's counsel in the Underlying Litigation on October 24, 2003.  (Pl's Mot. Partial Summ. J. Ex. B, letter from Halberstadt.)  Mr. Halberstadt's letter, accompanied by a subpoena, informed the Harding firm that Healthcare Advocates sought production of their computers and the copies of the archived screenshots that were made.  Mr. Halberstadt stated that he believed the firm's actions in obtaining the images might have violated

Pennsylvania's laws.  He requested that nothing be deleted or altered on the Harding firm's computers, and all copies of the requested documents be preserved.  (Id.)  Mr. Halberstadt's letter said nothing about preserving the temporary cache files on these computers.  The Harding firm read this request as asking them to preserve the copies of the screenshots they viewed through the Wayback Machine, which they preserved.  (Pl's Mot. Partial Summ. J. Ex. C, Earley Dep. at 205, 217.)  The Harding firm did not think that there was anything to preserve on their computers, as they had not saved the screenshots to their hard drives.  (Pl's Mot. Partial Summ. J. Ex. B, Bonini Dep. at 245.)

Ultimately, the cache files were deleted from the Harding firm's computers.  However, no evidence has been presented showing that the Harding firm was responsible for erasing them.  The files were deleted automatically.  Plaintiff's expert, Gideon Lenkey, stated at his deposition that cache files are handled automatically by the computer.  (Pl's Mot. Partial Summ. J. Ex. G, Lenkey Dep. at 106.)  The cache files may have been emptied dozens of times before the request for production was made, which was well over three months after the Harding firm accessed the Wayback Machine.  (See Pl's Mot. Summ. J. Ex. F, Edward Felton's Expert Report at 5 (noting that some cache files are discarded after only twenty-four hours).)  The most important fact regarding the lost evidence is that the Harding firm did not affirmatively destroy the evidence. Cf. Zubulake, 220 F.R.D. at 220-21 (company continued to destroy backup tapes even after these tapes were specifically requested by plaintiff).  Quite the contrary, the Harding firm actually provided Healthcare Advocates with forensic images of their computer's hard drives.  (Pl's Mot. Partial Summ. J. Ex. D, Riddle Dep. at 223.)  Very little fault can be attributed to the Harding firm for the loss of these temporary cache files.

Regarding the second consideration, Healthcare Advocates has not suffered significant prejudice from not being able to look at these temporary files.  Healthcare Advocates claims that its investigation was stunted by the absence of these temporary cache files.  It bases this assertion on its expert Gideon Lenkey who noted in his deposition that, "You cannot have enough data in analysis."  (Pl's Mot. Partial Summ. J. Ex. G, Lenkey Dep. at 55.)  However, Mr. Lenkey stated in the same paragraph that even without a perfect evidentiary situation he was able to piece together what occurred from the data available.  He stated that, "we got there in the end, it just took time."  (Id.)  It appears that Healthcare Advocates suffered very little prejudice due to the lost evidence.

The third consideration addresses the ability of lesser sanctions to remedy the situation,  I do not think that any sanction is necessary here.  Healthcare Advocates was able to obtain the information that it needed through the forensic images of the Harding firm's computer hard drives.  (Id.)  The Harding firm did not purposefully destroy evidence.  To impose a sanction on the Harding firm for not preserving temporary files that were not requested, and might have been lost the second another website was visited, does not seem to be a proper situation for an adverse spoilation inference.  Healthcare Advocates's request for an adverse inference in regard to the cache files is denied.  Since Healthcare Advocates has presented no evidence on the issue of whether the Harding firm infringed its right of reproduction in regard to involuntarily saved archived images in cache files, the Harding firm is granted summary judgement on this claim.

Healthcare Advocates' final copyright claim alleges that the Harding firm distributed the copies it made of the archived images to co-counsel in the Underlying Litigation.  No evidence has been presented showing that any distribution occurred.  The attorneys who worked on the

case all stated in their depositions that they did not provide copies of the archived images to co-counsel in the Underlying Litigation.  (Def's Mot. Summ J. Ex. G, Earley Dep. at 202; Ex. H, Bonini Dep. at 219; Ex. I, Riddle Dep. at 201.)  Copies of the screenshots were presented to this Court in camera, but Plaintiff did not include this act in its allegations.[6]  Healthcare Advocates has not come forth with any evidence showing that the Harding firm provided copies to co-counsel in the Underlying Litigation.  The Harding firm is therefore granted summary judgment on this infringement claim.

In summation, Healthcare Advocates has presented deposition testimony that shows that the Harding firm viewed the archived screenshots of Healthcare Advocates' website on their computers.  The facts also demonstrate that the Harding firm printed out paper copies of the images they viewed.  However, the evidence does not show that employees of the Harding firm saved the archived images onto their computer hard drives, nor has Healthcare Advocates presented evidence showing that it would be entitled to an adverse inference instruction at trial. Finally, no evidence has been presented showing that the Harding firm distributed the printed copies to their co-counsel in the Underlying Litigation.  Ultimately, the facts show that the Harding firm's use of the archived screenshots constitutes a fair use under copyright law.  As such, the Harding firm must be granted summary judgment on count II of Healthcare Advocates' Second Amended Complaint.

---

[6] Copies of the archived screenshots were submitted to this Court in camera during the Underlying Litigation.  Healthcare Advocates' has not claimed that this action by the Harding firm constitutes infringement of their copyright rights.  According to a leading treatise on copyright law, no court has found that presentation of the copyrighted works to a court on which the infringement action is brought constitutes an instance of infringement.  4 Melville B. Nimmer & David Nimmer, Nimmer on Copyrights, § 13.05[D][2] (2003).  This Court is not of the opinion that this action would be infringement, but a claim to this effect has not been raised, so this Court need not fully address the question.

### B.       Digital Millennium Copyright Act

The DMCA makes it a violation of copyright law for a person to engage in activity commonly referred to as hacking when the object of that activity is to access copyrighted material that is protected by technological means.  The statute was enacted to address the problem of copyright infringement committed via the Internet.  The statute states, "No person shall circumvent a technological measure that effectively controls access to a work protected under this title."  17 U.S.C. § 1201(a)(1)(A) (2007).  "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner[.]" 17 U.S.C. § 1201(a)(3(A).  "[A] technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work."  17 U.S.C. § 1201(a)(3(B).

The measure at issue in this case is the robots.txt protocol.  No court has found that a robots.txt file universally constitutes a "technological measure effectively controll[ing] access" under the DMCA.  The protocol by itself is not analogous to digital password protection or encryption.  However, in this case, when all systems involved in processing requests via the Wayback Machine are operating properly, the placement of a correct robots.txt file on Healthcare Advocates' current website does work to block users from accessing archived screenshots of its website.  (Pl's Mot. Partial Summ. J. Ex. F, Expert Report of Edward Felton at 10).  The only way to gain access would be for Healthcare Advocates to remove the robots.txt file from its website, and only the website owner can remove the robots.txt file.  Thus, in this situation, the

robots.txt file qualifies as a technological measure effectively controlling access to the archived copyrighted images of Healthcare Advocates. This finding should not be interpreted as a finding that a robots.txt file universally qualifies as a technological measure that controls access to copyrighted works under the DMCA.

The material facts in this case are not in dispute. On the dates in question, the servers at Internet Archive were malfunctioning due to a cache exhaustion condition. (Pl's Mot. Partial Summ. J. Ex. G, Lenkey Dep. at 45.) Requests made via the Wayback Machine for images that should have been blocked were instead filled. The Harding firm was able to view these images only because of this server error. Plaintiff's expert Gideon Lenkey and Defendants' expert Edward Felton have both testified, and written in their reports, that the employees of the Harding firm did not circumvent the protective measure utilized by Healthcare Advocates.

Gideon Lenkey wrote in his report that Internet Archive experienced a problem with its computer servers resulting in a malfunction which allowed users to access archived screenshots that should have been blocked. He wrote:

> According to IA [the access granted to the Harding firm] was due to a cache error caused by a database resource exhaustion condition and exacerbated by heavy use on that date. This condition caused the affected servers in the cluster to *forget* that it had a copy of the HCA robots.txt file. Because the file was not present in the cache [,] the [Internet Archive] servers, by design and in an effort to protect the rights and privacy of the archived content's owners, would attempt to determine if the queried site had a robots.txt file in place. On some occasions and for reasons unknown these two servers would determine that robots.txt file did *not* exist on the HCA site and on those occasions would deliver the protected content. The requesting user would then be viewing specifically prohibited content without authorization from HCA or IA.

(Pl's Mot. Partial Summ. J. Ex. G, Report of Gideon Lenkey at 6.)

In his deposition testimony, Mr. Lenkey reiterated the conclusions he stated in his report.

26

He said that two of the servers which processed Wayback Machine requests at Internet Archive were malfunctioning.  (Pl's Mot. Partial Summ. J. Ex. G, Lenkey Dep. at 45.)  "What would happen is [the server] would sort of forget about protective controls once it hit this condition."  (Id.)  Most importantly, Mr. Lenkey stated that he "found no evidence of a hack, meaning - - and by definition, where someone created a tool to go out and, with malicious intent, use that tool against a target."  (Id. at 46.)  Mr. Lenkey said that the Harding firm accessed the Internet Archive's website with only an ordinary web browser, they did not employ any special tools.  (Id. at 61.)  Mr. Lenkey also stated that the Harding firm had absolutely no part in creating the exhaustion condition in Internet Archive's servers.  (Id. at 48-49).

Edward Felton presented similar findings on how the Harding firm gained access to the archived screenshots of Healthcare Advocates' website.  In his report, Mr. Felton also stated that the Defendants did not engage in "hacking."  (Pl's Mot. Partial Summ. J. Ex. F, Expert Report of Edward Felton at ¶ 43.)  He testified that he used the term hacking in his report to mean activity that is devious and out of the ordinary.  (Pl's Mot. Partial Summ. J. Ex. F, Felton Dep. at 133.)  He also noted that the Harding firm's "role was simple – to request files by the usual means, and to receive them."  (Pl's Mot. Partial Summ. J. Ex. F, Expert Report of Edward Felton at ¶ 48.)  The experts agree that the Harding firm made requests via the Wayback Machine, and those requests were filled only because Internet Archive's servers malfunctioned.  The facts show that the robots.txt file utilized by Healthcare Advocates had no effect when the Harding firm requested the archived screenshots that were returned.

As there is no dispute concerning the material facts, the issue before this Court is whether this evidence shows that the Harding firm circumvented the robots.txt file present on Healthcare

Advocates' website.  My interpretation of the statute starts with the plain meaning of the words used.  The DMCA states that circumvention means to descramble, decrypt, avoid, bypass, remove, deactiviate, or impair a technological measure.  17 U.S.C. § 1201(a)(3)(A).  Healthcare Advocates' argument  focuses on the terms "avoid" and "bypass" presumably because the other terms do not encompass what occurred in this situation.  "Avoid" is defined as "to keep away from; keep clear of; shun; or to make void."  The Random House College Dictionary, 84 (1973).  "Bypass" is defined as "to avoid."  Id. at 186.  These words, as well as the remainder of the words describing circumvent, imply that a person circumvents a technological measure only when he affirmatively performs an action that disables or voids the measure that was installed to prevent them from accessing the copyrighted material.

When the Harding firm accessed Internet Archive's database on July 9, 2003, and July 14, 2003, it was as though the protective measure was not present.  Charles Riddle and Kimber Titus simply made requests through the Wayback Machine that were filled.  They received the images they requested only because the servers processing the requests disregarded the robots.txt file present on Healthcare Advocates' website.  As far as the Harding firm knew, no protective measures were in place in regard to the archived screenshots they were able to view.  They could not avoid or bypass any protective measure, because nothing stood in the way of them viewing these screenshots.  Healthcare Advocates has not presented any evidence to show that the Harding firm did anything to avoid or bypass the robots.txt file in place on its website.  The facts presented show that the Harding firm benefitted from a malfunction in Internet Archive's servers.  Plaintiff has not shown that Defendants circumvented the robots.txt file.

As the facts do not show that the Harding firm avoided or bypassed the robots.txt file on

Healthcare Advocates' website, Plaintiff attempts to convince this court that circumvention must be analyzed according to what the Harding firm knew, not what they did.  The evidence shows that the Harding firm knew that they were not permitted to view certain archived images, because some of the images were blocked.  Thus, Healthcare Advocates claims that Defendants knew or should have known that they were not supposed to be able to view any of the screenshots. Healthcare Advocates argues that any request made for archived images after the first request resulted in a denial constitutes circumvention of its robots.txt file.  It thinks that recent case law supports this proposition.

Healthcare Advocates believes the case of Univ. City Studios, Inc., v. Corley, 273 F.3d 429 (2d Cir. 2001), is relevant here.  There, the defendant posted instructions on the Internet detailing how people could get around encrypted language on DVDs that prevented those DVDs from being played anywhere but in a player with the decryption code.  Id. at 452-53.  The court found the encryption code similar to a padlock, and analogized the defendant's instructions as a skeleton key.  Id.  Thus, that court found that by using the decryption code a user was breaking the lock which constituted circumvention under the DMCA.  Id.  By posting the instructions on the web, that defendant was aiding people in bypassing the lock.

Healthcare Advocates also believes I.M.S. Inquiry Mgmt. Sys., Ltd., v. Bershire Info. Sys., Inc., 307 F. Supp. 2d 521 (S.D.N.Y. 2004), is relevant to this civil action.  But, in that case, a New York federal district court found that the unauthorized use of a password did not constitute circumvention under the DMCA.  Id. at 530-33.  While the defendant was not given permission to use the password from the password owner, the court held that his action was not a circumvention of the password protection.  Id. at 532-33.  That court found that the defendant's

actions did not avoid or bypass the password protection even though those terms were meant to be interpreted broadly.  Id.  That court noted that what the defendant avoided was the permission to use the password, and that was not the situation the DMCA was written to address.  That court said that the DMCA deals with situations where the digital walls guarding copyrighted material are avoided.  Id.  That defendant did not avoid the wall, rather he simply stole the key and opened the door himself.

Neither of these cases lend support to Plaintiff's assertion.  These cases do not stand for the proposition that Plaintiff's robots.txt file was circumvented merely by the Harding firm making requests via the Wayback Machine.  The Harding firm did not use alter code language to render the robots.txt file void like the defendant in Corley did with the encryption.  They did not "pick the lock" and avoid or bypass the protective measure, because there was no lock to pick.  Internet Archive's servers said that no lock existed when the requests were made.  Nor did the Harding firm steal passwords to get around a protective barrier like the defendant in the I.M.S. case.  No protective wall existed according to the Wayback Machine.  The Harding firm could not "avoid" or "bypass" a digital wall that was not there.  The court in the I.M.S. case said that a lack of permission does not constitute circumvention under the DMCA.  Simply making further requests is not circumvention under the DMCA.

 Healthcare Advocates' inference that the Harding firm should have known that they were not allowed to view any archived images via the Wayback Machine is both unreasonable and irrelevant.  Mr. Riddle and Ms. Titus testified that they knew some of the images they tried to access were blocked.  (Pl's Mot. Partial Summ. J. Ex. D, Riddle Dep. at 123-24; Ex. E, Titus Dep. at 78-80.)  When the screenshot was blocked, the Wayback Machine returned a message

stating that the page was blocked by the website owner.  (Pl's Mot. Partial Summ. J. Ex. C,

printout of "Robots.txt Query Exclusion" page; Ex. D, Riddle Dep. at 139; Ex. E, Titus Dep. at

107-09.)  The message also included links, one of which said, "Try another request or click here

to search for all pages on healthcareadvocates.com."  (Pl's Mot. Partial Summ. J. Ex. C, printout

of "Robots.txt Query Exclusion" page.)  Ms. Titus testified that when this page appeared, she

clicked on the link and received a list of all available screenshots, which she viewed and printed.

(Pl's Mot. Partial Summ. J. Ex. E, Titus Dep. at 107.)  Even if it the Harding firm knew that

Healthcare Advocates did not give them permission to see its archived screenshots, lack of

permission is not circumvention under the DMCA.

The Harding firm did not circumvent the robots.txt file utilized by Healthcare Advocates.

Making requests for archived images via the Wayback Machine, even after some requests were

denied, is not avoiding or bypassing the measure.  The facts show that the Harding firm received

the archived images solely because of a malfunction in the servers processing the requests.  The

Harding firm is therefore granted summary judgment on count I of Plaintiff's Second Amended

Complaint.  Healthcare Advocates' Motion is consequently denied.

### C.      Computer Fraud and Abuse Act

Healthcare Advocates alleges that the Harding firm exceeded its authorized access by

merely viewing  archived screenshots of Healthcare Advocates' website via the Wayback

Machine.  (Compl. ¶ 85.)  The CFAA is the centerpiece of federal enforcement efforts against

computer based crimes.  The statute makes it a crime to "intentionally access[] a computer

without authorization or exceed[] authorization, and thereby obtain[] information from any

protected computer if the conduct involved interstate or foreign communication[.]"  18 U.S.C. §

1030(a)(2)(C) (2007).  "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]"  18 U.S.C. § 1030(e)(6).  A protected computer is one "used in interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B).

Under the statute, "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."  18 U.S.C. § 1030(g).  "A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."  Id.  Subsection 1030(a)(5)(B)(i) imposes a requirement that the party bringing the claim must suffer a loss "during any 1–year period . . . aggregating at least $5,000 in value[.]" "Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages."  18 U.S.C. § 1030(g).

While Healthcare Advocates' computers were not accessed by the Harding firm, that fact does not bar them from seeking the remedy available under this statute.  Healthcare Advocates only needs to show that the Harding firm unlawfully accessed some protected computer, and by those actions, Healthcare Advocates was harmed.  The facts show that the Harding firm accessed the Wayback Machine from their offices in Pennsylvania while investigating the claims against their clients.  (See Pl's Mot. Partial Summ. J. Ex. B, Bonini Dep. at 10.)  Internet Archive's offices are located in California, and it maintains its database of archive images there as well. (See Pl's Mot. Partial Summ. J. Ex. I, Mohr Dep. at 39-40.)  Therefore, Internet Archive's computers were used in interstate commerce, and are protected computers under the CFAA.

The next question that needs to be addressed is whether Healthcare Advocates has

suffered the loss required for it to even raise a claim under the CFAA.  Healthcare Advocates

must show that it has suffered a loss in the aggregate of $5,000.  Loss is defined in the statute as

"any reasonable cost to any victim, including the cost of responding to an offense, conducting a

damage assessment, and restoring the data, program system, or information to its condition prior

to the offense, and any revenue lost, cost incurred, or other consequential damage incurred

because of interruption of service[.]"  18 U.S.C. § 1030(e)(11).

Kevin Flynn, president of Healthcare Advocates, said in his deposition that the company

sustained no physical damage to its computers.  (Pl's Mot. Partial Summ. J. Ex. A, Flynn Dep. at

216.)  However, Mr. Flynn testified that Healthcare Advocates suffered economic harm in having

to investigate how the Harding firm obtained the archived information, and in determining what

his company's legal duties were concerning any secure data that may have been contained in

those archived screenshots.  (Id.)  His investigation occurred after the Complaint was filed.

Mr. Flynn testified that there were direct out of pocket expenses to Healthcare Advocates

of about $750.  (Id. at 216-17.)  For the purposes of this Motion, the Harding firm does not

dispute this amount.  Healthcare Advocates claims that the remainder of the $5,000 requirement

consists of the time spent by Mr. Flynn investigating the problem, approximately 160 hours.  (Id.

at 217.)  Mr. Flynn valued his time at between $60–100 per hour, which would mean that

Healthcare Advocates incurred between $9,600–16,000 in expenses for Mr. Flynn's services.

(Id. at 229.)  While Mr. Flynn has not stated exactly what type of investigative work he

performed, but the statute allows the costs of time spent assessing computer systems to be

counted towards the loss requirement.  See 18 U.S.C. § 1030(e)(11).

Mr. Flynn also mentioned other costs incurred by Healthcare Advocates during the

Underlying Litigation, such as litigation expenses, attorney's fees, and the costs of hiring experts. (Pl's Mot. Partial Summ. J. Ex. A, Flynn Dep. at 219-228.)  These costs cannot be counted toward the statutory threshold.  See Wilson v. Moreau, 440 F. Supp. 2d 81, 110 (D.R.I. 2006).  It should be noted that Mr. Flynn's 160 hour total included four days he spent doing legal research at the Jenkins Law Library.  (Pl's Mot. Partial Summ. J. Ex. A, Flynn Dep. at 219.)  These hours may not count towards the threshold amount as they do not appear to be involved in assessing the integrity of Healthcare Advocates' computer systems.  Disregarding the time Mr. Flynn spent in the Jenkins Law Library, it still appears that Healthcare Advocates has established their $5,000 loss requirement based on Mr. Flynn's testimony.  Healthcare Advocates may bring this claim.

The material facts pertinent to this claim are the same as the facts relevant to the above discussion under the DMCA.  No dispute exists between the parties as to the Harding firm's actions regarding the Wayback Machine, or the server malfunction that resulted in the archived images being presented upon request.  Thus, the question before this Court is whether these facts show that the Harding firm exceeded its authorized access and violated the prohibitions of the CFAA.

Exceeding authorized access means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6)   The term "authorization" has not been defined in the statute.  Therefore, I must apply the word's ordinary meaning in my interpretation.  Authority is defined as "a power or right delegated."  The Random House College Dictionary 91 (1973).  The statute penalizes persons who obtain information from a protected computer by intentional and unauthorized access.  18 U.S.C. § 1030(a)(2).  The statute specifies an "intentional standard

34

[because it] is designed to focus Federal criminal prosecutions on those whose conduct evinces a clear intent to enter, without proper authorization, computer files or data belonging to another." United States v. Morris, 928 F.2d 504, 508 (2d Cir. 1991).  Viewing material on a computer screen constitutes "obtaining" information under the CFAA.  See S. Rep. No. 99-432, at 6-7 (1986).  The Harding firm must have intentionally viewed screenshots it was not entitled to see to be liable under the CFAA.

Healthcare Advocates has not shown that the Harding firm viewed any images that they were not entitled to see.  The facts show that the Harding firm made requests via their web browsers to the Wayback Machine to view archived web pages, and those requests were filled. (Pl's Mot. Partial Summ. J. Ex. D, Riddle Dep. at 117; Ex. E, Titus Dep. at 67-8.)  Kimber Titus testified that she typed the web address she sought into the Wayback Machine, hit the "Take Me Back" button, and a list of  screenshots available for viewing was presented.  (Pl's Mot. Partial Summ. J. Ex. E, Titus Dep. at 68-89.)  She clicked on the dates individually, and when an image appeared on her computer screen she printed a copy.  (Id. at 78.)  Ms. Titus testified that sometimes clicking on a date returned the "Robots.txt Query Exclusion" message.  (Id. at 107.) When this occurred, she clicked on the link that said "search here for all pages," and was provided with the list of dates from which she continued searching.  (Id.)  No evidence has been presented showing that the Harding firm did anything to get past the blocking mechanism.  The facts show that the Wayback Machine gave Ms. Titus the ability to view archived screenshots of Healthcare Advocates' website.

No evidence has been presented showing that the Harding firm exceeded that access.  The facts do not show that the Harding firm did anything other than use the Wayback Machine in the

manner it was intended to be used.  Gideon Lenkey testified that the Harding firm accessed the Internet Archive's website with only an ordinary web browser, they did not employ any special tools.  (Pl's Mot. Partial Summ. J. Ex. G, Lenkey Dep. at 61.)  He wrote that the Harding firm obtained these images because Internet Archive's servers experienced a condition that made them forget about protective controls.  "On some occasions and for reasons unknown these two servers would determine that robots.txt file did *not* exist on the HCA site and on those occasions would deliver the protected content."  (Pl's Mot. Partial Summ. J. Ex. G, Report of Gideon Lenkey at 6.)  The Harding firm only viewed the archived screenshots that the Wayback Machine provided.

As the facts do not show that the Harding firm exceeded the access provided, Plaintiff attempts to convince this Court that determination of this issue must focus on the fact that the Harding firm viewed archived screenshots that the copyright holder did not want them to see. Healthcare Advocates argues that the Harding firm's access was unauthorized because the images were viewed without its explicit permission.  This fact is irrelevant.  The statute only penalizes persons who exceed authorization.  The Harding firm was given the power to view the images by the Wayback Machine.  While the screenshots may have been returned in error, they were ultimately provided.  The Harding firm requested archived images from Internet Archive's database, and those requests were filled.  The Harding firm got lucky, because the servers were malfunctioning, but getting lucky is not equivalent to exceeding authorized access.

Healthcare Advocates cites Southwest Airlines v. Farechase, Inc., 318 F. Supp. 2d 435 (N.D. Tex. 2004), as relevant to this case.  In that case, the court found that Southwest had sufficiently stated a claim under the CFAA by showing that a person who was given access to fare and price information on Southwest's website had repeatedly used scraping software to steal

that information for use on his own website.  Id. at 439-40.  In that case, the defendant had agreed not to scrape the information, and the court found that these facts sufficiently alleged a claim under the CFAA.  Here, the evidence shows that the Harding firm received the messages stating that the images were blocked.  But, unlike the defendant in Southwest, the Harding firm took no action after they were informed that they were not authorized to see those screenshots.

A cursory review of applicable case law shows that defendants need to something more than merely using a public website in the manner it was intended to be liable under the CFAA. See Morris, 928 F.2d at 508 (transmission of worm was access without authorization); Int'l Airport Centers, L.L.C. v. Citrin, 440 F.3d 418, 419-20 (7th Cir. 2006) (employee who downloaded secure erasure program to his computer at work would be exceeding authorized access under CFAA); EF Cultural Travel v. Zefer Corp., 318 F.3d 58, 62-63 (1st Cir. 2003) (explicit statement on website restricting scraping could establish that defendant who scraped information exceeded authorized access); United States v. Mitra, 405 F.3d 492, 494-495 (7th Cir. 2005) (interference with computer based radio system used by police, fire, and ambulance was unauthorized access).

Healthcare Advocates has not provided evidence showing that the Harding firm intentionally exceeded their authorized access.  Summary judgment must be granted in favor of the Harding firm on count III of the Second Amended Complaint.  Healthcare Advocates' Motion for the same is consequently denied.

### D.     Common Law Conversion and Trespass to Chattels Claims

Healthcare Advocates' final two claims arise under the laws of Pennsylvania. In these allegations, Healthcare Advocates avers that the Harding firm interfered with its common law

rights in respect to the copyrighted archived screenshots.  In paragraph 98 of the Second

Amended Complaint, it alleged that the Harding firm's "conduct amounted to an intermeddling

with Healthcare Advocates' possessory rights in the archived historical content of the

www.healthcareadvocates.com web site."  In Paragraph 103, Plaintiff claims that the Harding

firm's "conduct seriously interfered with Healthcare Advocates' lawful right of control over the

content of the www.healthcareadvocates.com web site."

The Copyright Act contains a provision explicitly stating that all common law or state

law rights that are equivalent to the rights available under copyright protections are preempted.

17 U.S.C. § 301(a) (2007).[7]  The Third Circuit has articulated the extra element test to assess

when common law claims are preempted by this provision.  Under the test, "[I]f a state cause of

action requires an extra element, beyond mere copying, preparation of derivative works,

performance, distribution or display, then the state cause of action is qualitatively different from,

and not subsumed within, a copyright infringement claim and federal law will not preempt the

state action."  Dun & Bradstreet Software Serv., Inc., v. Grace Consulting, Inc., 307 F.3d 197,

217 (3d Cir. 2002).  These common law claims must require another element beyond what the

copyright infringement test already requires to survive preemption.

Under Pennsylvania law, the common law tort of trespass to chattels is governed by the

Restatement (Second) of Torts § 217.  That section states that a trespass to chattel may be

---

[7] § 301. Preemption with respect to other laws

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

committed by (a) dispossessing another of their chattel, or (b) using or intermeddling with a chattel in the possession of another.  Pestco, Inc. v. Assoc. Products, Inc., 880 A.2d 700, 708 (Pa. Super. Ct. 2005).  Conversion is defined in § 222 of the Restatement (Second) of Torts as a serious interference with the chattel of another.  Intermeddling means to interfere.  The Random House College Dictionary 694 (1973).  The tests for these claims require nothing more than what is required under copyright law to establish infringement.  Healthcare Advocates merely seeks to remedy its federal copyright rights under the laws of Pennsylvania.  These common law claims are preempted under 17 U.S.C. §301(a).  Thus, the Harding firm is granted summary judgment on counts V and VI of Healthcare Advocates' Second Amended Complaint.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| HEALTHCARE ADVOCATES, INC., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 05-3524 |
| | : | |
| HARDING, EARLEY, FOLLMER & FRAILEY, et. al., | : | |
| | : | |
| Defendants. | : | |

_____

## ORDER

   **AND NOW**, this   20th  day of July 2007, upon consideration of Defendants'

Motion for Summary Judgment, Plaintiff's Motion for Partial Summary Judgment, and the

Responses in Opposition thereto, it is hereby **ORDERED** that Defendants' Motion for Summary

Judgment (Doc. No. 56) is **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment

(Doc. No. 58) is **DENIED**.


                                                  BY THE COURT:


                                                  /s/ Robert F. Kelly_____
                                                  ROBERT F. KELLY
                                                  SENIOR JUDGE